**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| FINANCIAL HOLDINGS, INC., | ) | Case No. 15-51187 |
| | ) | |
| DEBTOR. | ) | Chapter 11 |
| | ) | |

**DECLARATION OF BARRY C. BRAUCH
IN SUPPORT OF FIRST DAY PLEADINGS**

I, Barry C. Brauch, being duly sworn, declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Executive Officer of Financial Holdings, Inc., f/k/a American Founders Bancorp, Inc., the debtor and debtor-in-possession in the above-captioned chapter 11 bankruptcy case ("FHI" or the "Debtor").  As an officer of the Debtor, I am generally familiar with its day-to-day operations, businesses and financial affairs.[1]

2.      On June 16, 2015 (the "Petition Date"), FHI filed a voluntary petition for relief (the "Petition") under chapter 11 of title 11 of the United States Code 11 U.S.C. §§ 101 *et seq.* (collectively, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Kentucky, Lexington Division (the "Court").  In order to minimize disruption to FHI's business (and the business of the Bank, as that term is defined below)[2] as result of this bankruptcy case (the "Case"), to maintain and maximize the value of FHI's estate, and to establish procedures for the administration of the Case, FHI has, contemporaneously herewith,

---

[1] I have been the CEO of FHI since July 2012.  I previously served as Executive Vice President and Chief Financial Officer of FHI since August 2007.  I also began serving as Chief Operations Officer of the Debtor's subsidiary, American Founders Bank, Inc. in December 2009.  American Founders Bank, Inc. is not a debtor in this chapter 11 case.

[2] The Bank, a non-debtor, is wholly owned by FHI—so any disruption to it, including customer concerns, could affect the value of FHI's estate.

requested certain "first-day" relief by filing various motions and applications with the Court (collectively, the "First-Day Pleadings").

3.      I submit this declaration (this "Declaration") (a) in support of (i) the Petition, and (ii) the First-Day Pleadings; and (b) to assist the Court and other interested parties in understanding the circumstances that resulted in the commencement of the Case.  All facts set forth in this Declaration are based upon my personal knowledge, my discussions with other FHI officers and senior management, my review of relevant documents, or my opinion based upon experience, knowledge and information concerning the operation of FHI and the industry in which it operates.  While I have made every reasonable effort to ensure that the information contained herein is accurate and complete based upon information that was available at the time of preparation, the subsequent receipt of information may result in material changes to financial data and other information contained herein.  If called to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of FHI.

## BACKGROUND AND HISTORY

*Formation of FHI and the Bank*

4.      FHI was incorporated in 2005 under the laws of the Commonwealth of Kentucky primarily to serve as the holding company for American Founders Bank, Inc. (the "Bank"). FHI's principal place of business is 318 East Main Street Lexington Kentucky 40507 and FHI has been located at such premises in excess of one hundred eighty (180) days.

5.      FHI is single bank holding company that owns 100% of the common stock of two subsidiaries, neither of which is a debtor in the Case:  the Bank and American Founders Statutory Trust I (the "Statutory Trust").  The Bank, in turn, owns 100% of the voting common stock of American Founders Loan Corporation ("AFLC," and together with the Bank and the

2

Statutory Trust, the "<u>Non-Debtor Subsidiaries</u>").   AFLC is not a debtor in the Case.   An

organizational chart of FHI and the Non-Debtor Subsidiaries is attached hereto as **<u>Exhibit A</u>**.

6.       The Bank is a Kentucky state-chartered, non-member bank that was chartered in

2001.   The Bank serves both corporate and individual customers by providing a full range of

banking products and services, including commercial, installment, and other types of loans;

residential mortgages; certificates of deposit; and other traditional deposit accounts that best

serve its market.   The Bank's deposits are insured by the Federal Deposit Insurance Corporation

(the "<u>FDIC</u>") and the Bank is subject to regulation by the FDIC and the Kentucky Department of

Financial Institutions (the "<u>KDFI</u>").   FHI is subject to regulation by the Board of Governors of

the Federal Reserve System through the Federal Reserve Bank of St. Louis (the "<u>Federal Reserve</u>

<u>Bank</u>").

*<u>Expansion of the Bank and Initial Distress</u>*

7.       From its inception in 2001, the Bank expanded steadily, primarily by building its

real estate loan portfolio.   During this period the Bank also made one financial institution

acquisition in the Lexington, Kentucky market.   Near its peak size at December 31, 2006, the

Bank had total assets of approximately $624 million and deposits of approximately $498 million.

The Bank had total loans and leases of $453 million, with a Tier 1 Leverage capital ratio of

11.9% and a risk-based capital ratio of 13.2%.   Shortly thereafter, troubled loans and real estate

exposure began taking a toll on the Bank's profitability and capital ratios.   By May 31, 2012, the

Bank's Tier 1 Leverage capital ratio had decreased to 4.5% and its Total Risk-Based capital ratio

had decreased to 7.4%.

8.       On February 22, 2007, the Bank consented to an Order to Cease and Desist issued

by the FDIC and the KDFI, which order was subsequently amended on September 6, 2007 (as

amended, the "<u>Cease and Desist Order</u>").   FHI was not party to the Cease and Desist Order.   The

Cease and Desist Order required, among other things, that the Bank cease and desist from certain unsafe or unsound banking practices, evaluate the effectiveness of its management team and adopt and maintain a variety of policies and procedures designed to manage risk, improve capitalization and generally increase the quality of its internal controls.  The Cease and Desist Order also required the Bank to achieve and maintain its Tier 1 Leverage capital ratio at a minimum of 8%.

9.      On August 20, 2007, FHI entered into a Memorandum of Understanding (the "MOU") with the Federal Reserve Bank.  Under the MOU, FHI is required to assist the Bank in certain regulatory matters.  The MOU also requires, among other things, that FHI obtain approval from the Federal Reserve Bank to take dividends or other payments from the Bank, declare corporate dividends, make payments to any insiders, pay interest on its trust preferred securities, redeem stock or incur debt.  By its terms, the MOU is not a "written agreement" for purposes of Section 8 of the Federal Deposit Insurance Act, as amended.

*Restructuring and Shrinkage of the Bank*

10.     FHI and the Bank began a major operational and strategic restructuring in early 2007, after higher risk lending policies and operational control issues created by the Bank's prior management had raised significant concerns with various regulatory authorities.  In April, 2007, the boards of directors of FHI and the Bank accepted the resignations of the management team, including the CEO, COO and Senior Loan Officer.  In June 2007, FHI's board of directors hired a new president and chief executive officer who immediately began building a more experienced management team to:  (i) adopt improved risk and operational management and control policies, (ii) deal with the legacy troubled assets, and (iii) create and implement a strategy, organization and culture to reposition the Bank as a strong, multi-branch bank offering an experienced and

sophisticated approach to its client base and filling a service void created by the large, money-center, multi-state banks operating in the Bank's markets.   The new management[3] focused on restructuring the Bank's balance sheet and reducing its troubled asset exposure.   The result of these efforts was to reduce "classified" loans (substandard, nonaccrual and doubtful loans) from a peak of $67.4 million at September 30, 2007 to $30.3 million at May 31, 2012.   The level of "classified" loans as of March 31, 2015 was $8.2 million.

11.     In December 2007, after completing a number of operational changes to improve risk management and controls, current management launched a new vision and strategic plan for the Bank and opened its first branch in the Louisville market.   In March 2008, management formed a new commercial and private banking lending department.

12.     In December, 2008, the Bank formed its non-debtor subsidiary, AFLC, which raised $6.0 million through an offering of non-cumulative, perpetual preferred stock to acquire and subsequently manage $35.1 million and $7.8 million of the Bank's nonperforming loans and portfolio of non-earning, other real estate owned ("OREO"), respectively.   The Bank retains a 100% voting interest, but minority equity interest, in AFLC, which equity interest qualifies as Tier 1 capital for regulatory purposes.

13.     In May 2009, the Bank completed a transaction with MainSource Bank that resulted in the sale of three Bank branches in Frankfort and Lawrenceburg, Kentucky and the purchase of one MainSource branch in Louisville, Kentucky.   The transaction resulted in a net $60.8 million decrease in loans, net $88.4 million decrease in deposits and a gain on the transaction of $4.7 million.

---

[3] As noted above, I was initially hired as Executive Vice President and CFO in August 2007 as part of the installation of new management following the entry of the Cease and Desist Order.

14.    On October 12, 2010, the Cease and Desist Order was terminated and the Bank entered into a consent order with the FDIC and the KDFI, which eliminated many of the requirements of the Cease and Desist Order.  The consent order required the Bank to, among other things:  (i) maintain its Total Risk-Based capital ratio at a minimum of 12.0%; (ii) maintain its Tier 1 Leverage capital ratio at a minimum of 8.0%; and (iii) restrict dividend payments.

15.    On October 31, 2012, the Bank, the FDIC, and the KDFI amended the consent order (the "Amended Consent Order"), to include a deadline of December 31, 2012 to reach the aforementioned 8% and 12% capital ratio requirements.  Under the Amended Consent Order, if the Bank did not achieve these capital levels by such deadline, the FDIC and the KDFI could direct the Bank, on thirty (30) days' notice, to "develop, adopt, and implement a written plan to sell or merge itself into another federally insured financial institution or to otherwise obtain sufficient capital investment into the Bank to fully meet" the capital ratio requirements (the "FDIC Sale/Capital Raise Directive").  The Bank has yet to achieve these capital ratio requirements.  On March 31, 2015, the Bank's Tier 1 Leverage capital ratio was 5.60% and its Total Risk-Based capital ratio was 8.86%.

16.    Prior to November 2012, the Bank operated seven branches:  four branches in Lexington, Kentucky; two branches in Louisville, Kentucky; and one branch in Shelbyville, Kentucky.  The Bank closed one of its Lexington branches in November 2012 when its lease expired.  With the intent of moving toward compliance with the Amended Consent Order, on December 7, 2012, the Bank completed a sale of its Shelbyville branch to MainSource Bank (the "Shelbyville Branch Sale").  The Bank now has 3 branches in Lexington, Kentucky and two branches in Louisville, Kentucky.  As mentioned above, the Bank has yet to achieve the capital ratio requirements of the Amended Consent Order.

## CAPITAL STRUCTURE OF DEBTOR

*FHI Debt Structure*

17.     Shortly after its formation, FHI borrowed approximately $12.0 million from U.S. Bank on a senior secured basis, evidenced by that certain Revolving Credit Promissory Note dated April 27, 2006 in the maximum principal amount of $15 million (the "Senior Note").  The Senior Note is secured by a first priority lien on 100% of the Bank's common stock (the "Bank Common Stock").  FHI has been in default under the Senior Note since 2010 and entered into several forbearance agreements with U.S. Bank.

18.     On August 27, 2012, U.S. Bank entered into an Assignment Agreement (the "Assignment"), pursuant to which it sold its interest in the Senior Note and related documents to WPB-AFB, LLC ("WPB-AFB").  Pursuant to the Senior Note, the Assignment, a stock power assignment and stock pledge agreement (which documents are attached hereto as collective **Exhibit B**), the Bank Common Stock is in the possession of WPB-AFB.

19.     The sole member and principal of WPB-AFB is William P. Butler ("Butler").  Butler was an original FHI shareholder upon the formation of FHI and currently holds (individually and through a partnership controlled by Butler) 15.05% of the common stock of FHI.  Butler is also (as described below) a holder of preferred shares and common stock warrants in AFLC, as well as a director of AFLC (and I understand, as such, is likely an "insider" as that term is defined in the Bankruptcy Code).

20.     As was the case when U.S. Bank held the Senior Note, FHI has continued in default under the Senior Note while held by WPB-AFB and has entered into several forbearance agreements with WPB-AFB.  As of the Petition Date, the balance on the Senior Note (principal amount plus accrued and unpaid interest) is at least $14,352,488.

21.     In April, 2006, a trust subsidiary formed by FHI, the Statutory Trust, issued $20.0 million of trust preferred securities (the "TruPS") in a closed pooled private offering of 20,000 securities with liquidation amount of $1,000 per share.  On the same day, FHI issued $20.6 million of Subordinated Debentures (the "Subordinated Debentures") to the Statutory Trust in exchange for ownership of all of the common equity of the Statutory Trust and the proceeds of the TruPS sold by the Statutory Trust.

22.     Wilmington Trust Company is the trustee of the Statutory Trust pursuant to an Amended and Restated Declaration of Trust dated April 26, 2006 and is also the indenture trustee for the Subordinated Debentures pursuant to an Indenture dated April 26, 2006 (the "Indenture").   FHI is not considered the primary beneficiary of the Statutory Trust, and accordingly the Statutory Trust is not consolidated in FHI's financial statements.   While the Subordinated Debentures are liabilities of FHI, the TruPS are liabilities of the Statutory Trust and, therefore, holders of the TruPS hold claims against the Statutory Trust and do not hold claims against, and are not creditors of, FHI.

23.     The Subordinated Debentures mature on April 1, 2036 and became callable by FHI, at its option, at 100% of the principal amount, plus accrued and unpaid interest, after June 15, 2011.  Interest on the Subordinated Debentures is payable quarterly and was fixed at 6.85% through June 15, 2011, at which time it converted to a variable rate of interest equal to 1.40% above three-month LIBOR.  FHI has the option to defer interest payments on the Subordinated Debentures for a period not to exceed five consecutive years and exercised this option beginning on July 1, 2008.  FHI has not made interest payments on the Subordinated Debentures since electing to defer such payments in 2008 and accordingly went into default under the Indenture in 2013.  Moreover, the filing of the Petition constitutes an Event of Default under Section 5.1(e) of

the Indenture.  Finally, Section 11.1 of the Indenture provides that, upon any sale of the entirety

(or substantially the entirety) of the assets of FHI, FHI covenants that the due and punctual

payment of principal and interest on the Subordinated Debentures (as well as the performance of

all covenants under the Indenture) will "be expressly assumed by supplemental indenture

satisfactory in form to the Trustee…by the entity which shall have acquired such property."

24.    As of the Petition Date, the balance on the Subordinated Debentures (principal

amount plus accrued and unpaid interest) is $26,278,844.

*FHI Equity Structure*

25.    As of the Petition Date, FHI had issued and outstanding 7,952,237 shares of

Common Stock, which are held by approximately 275 shareholders.

26.    As described in Paragraph 12 above, on December 29, 2008, the Bank formed

AFLC, to which it transferred certain nonaccrual loans, foreclosed assets and cash in exchange

for 36,000 shares (representing all outstanding shares) of common stock of AFLC.  AFLC is a

non-debtor subsidiary of the Bank.  On December 31, 2008, AFLC sold 200 shares of Series A

Non-Cumulative Non-Voting Preferred Stock (the "Series A AFLC Preferred Shares") and 100

shares of Series B Non-Cumulative Non-Voting Preferred Stock (the "Series B AFLC Preferred

Shares") (collectively, the "AFLC Preferred Shares").  The AFLC Preferred Shares are held by

parties other than the Bank (described in more detail below).  In the event of any liquidation,

dissolution or winding up of AFLC, whether voluntary or involuntary, the holders of the AFLC

Preferred Shares will be entitled to receive in the aggregate $6 million for the par value of the

AFLC Preferred Shares in preference to any distribution of the assets or surplus funds of AFLC

to Bank (as the holders of 100% of the AFLC common stock).  The AFLC Preferred Shares are

also accompanied by warrants exercisable for up to 28% of the common stock of AFLC upon the

occurrence of certain events (the "AFLC Warrants"). The AFLC Preferred Shares carry a 10% stated non-cumulative dividend.

27.    The Series A AFLC Preferred Shares (and accompanying AFLC Warrants) are held by two holders, one an institutional investor and the other an individual, neither of which is a creditor or shareholder of FHI. The Series B AFLC Preferred Shares (and accompanying AFLC Warrants) are owned in equal amounts by Butler and Brereton Jones ("Jones"). Jones also currently holds 16.77% of the common stock of FHI and is a director of FHI.

28.    The primary asset of FHI is its 100% ownership of Bank Common Stock. As described more fully in Paragraphs 32 and 33 below, FHI believes the value of the Bank to be within a range from approximately $3,000,000 to $7,375,000. Any realistic valuation of the Bank results in a value substantially less than the balance owed under the Senior Note and a fraction of the balance owed collectively between the Senior Note and the Subordinated Debentures. As further described below, I believe that the best way to maximize the value of the Bank Common Stock and, thus, the Debtor's estate, is to conduct the proposed section 363 sale of the Bank Common Stock.

**RESTRUCTURING EFFORTS AND EVENTS LEADING TO BANKRUPTCY**

29.    Over the last six years, FHI has made extraordinary efforts to raise additional capital or sell all or a portion of the Bank:

- In early 2009, FHI retained Hexagon Capital to assist in raising capital that would be used to enable the Bank in bringing its capital ratios into regulatory compliance in accordance with the Cease and Desist Order. Hexagon contacted approximately twenty institutional investors but the process did not result in the receipt of any indications of interest for a Bank capital infusion. In late 2010, with heightened urgency due to the Amended Consent Order,[4] FHI retained The Chicago Corporation

---

[4] In the wake of the Amended Consent Order it became even more clear to FHI and Bank management that (despite continuing progress in improving the asset quality of the Bank), given the significant FHI debt level between the Senior Note and the Subordinated Debentures, coupled with the Bank's anemic capital levels, the long-term ability

("TCC") to serve as financial advisor in connection with a recapitalization or sale of FHI and/or the Bank. TCC prepared a confidential information memorandum (the "2010 CIM") containing background, financial and regulatory information about FHI and the Bank and certain financial projections. Beginning in early 2011, TCC contacted over ninety institutional or accredited investors, with a primary goal of raising $35 million in capital for the Bank. Seventeen prospective investors executed nondisclosure agreements and reviewed the 2010 CIM. All of these parties subsequently declined to make a proposal to invest in the Bank.

- In the fall of 2011, TCC contacted thirty-five potential strategic buyers, primarily consisting of other banking organizations. This process did not result in any proposals for the purchase of FHI or the Bank.

- FHI continued to solicit organizations and investors with respect to a sale or recapitalization of FHI or the Bank, including branch sale transactions. In addition to due diligence (chiefly of the Bank's loan portfolio) conducted by several bank holding companies during 2012 and 2013, the most substantive negotiations for a transaction involving the Bank prior to the efforts in late 2014 described below were negotiations during 2012 with a central Kentucky-based financial institution ("Potential Acquiror A") for a transaction substantially similar to the currently proposed transactions for FHI and the Bank, namely, a proposed Section 363 sale of the Bank Common Stock by FHI accompanied by a sale by the Bank of its Lexington, Kentucky operations (a "Lexington Branches Transaction"). A confidentiality agreement was entered into with Potential Acquiror A on February 3, 2012 and various drafts of a branch purchase and assumption agreement were exchanged between Potential Acquiror A and the Bank, along with extensive due diligence conducted by Potential Acquiror A. Similar to the currently proposed transaction that will be described below, that prior attempted transaction contemplated (1) the assignment by the Bank to Potential Acquiror A of the Bank's real estate located in downtown Lexington, as well as all personal property owned by the Bank, in exchange for a cash sum, (2) the assignment of substantially all of the loans of the Bank attributed to its Lexington, Kentucky banking offices and (3) the assignment to Potential Acquiror A by the Bank of the Bank's deposit liabilities in exchange for a premium on such deposit liabilities. Due to certain deadlocks on deal points which arose in the negotiations the overall consideration to be received by the Bank was inadequate to place the Bank in a sufficient capital position, and accordingly the efforts by the Bank and Potential Acquiror A to enter a Branch Purchase and Assumption Agreement transaction were terminated in the first quarter of 2013.

- In 2012, WPB-AFB acquired the Senior Note. Butler and WPB-AFB have supported the subsequent efforts described below of FHI and the Bank to seek acquirers or new capital sources. Butler's willingness to serve as a stalking horse bidder should the need arise and forbearance from having WFB-AFB foreclose upon the Bank Common Stock given the longstanding default, as well as his direct communications

---

of the Bank to survive, much less satisfy the regulatory capital levels prescribed by the Amended Consent Order, would depend upon a recapitalization of, or a sale of all or a portion of the, Bank.

with our regulators, bought us the breathing room to conduct the thorough marketing process described below over the past few years (and for the Bank to stabilize itself operationally by, among other things, improving asset quality)—without having the bank seized or forced into a fire sale.

- In October, 2012, FHI retained Austin Associates, LLC ("Austin") to provide general financial advisory services in connection with its recapitalization efforts and to evaluate various proposed transaction alternatives, including evaluation of a transaction involving a section 363 sale of the Bank Common Stock along with a Lexington Branches Transaction. In connection with this engagement, Austin created financial forecasts respecting FHI and the Bank, prepared an analysis of AFLC's capital structure and assessed the present value of liquidating the AFLC Preferred Shares, projected the future capital needs of the Bank to achieve a satisfactory capital position, conducted an internal rate of return analysis of the Bank, compiled data with respect to all section 363 sales respecting banks and bank holding companies in the United States since 2010, and prepared a list of all financial institution mergers and acquisitions in the Midwest region of the United States during the prior two years. As a result of the aforedescribed work by Austin and the consideration of same by FHI and Bank management (which continued throughout 2013 and the first half of 2014), by way of another engagement letter dated September 3, 2014, FHI and the Bank once again engaged Austin (as well as Investment Bank Services), to serve as the exclusive financial advisor to FHI and the Bank for purposes of pursuing a bankruptcy filing and associated section 363 sale on the part of FHI or a sale of the Bank.

- In late 2014, Austin contacted thirty-one organizations which, based on geographic location and Austin's analysis of the respective financial capacity of such organizations, were viewed as possible candidates for the purchase of the Bank. Of these thirty-one financial institutions, nineteen requested a copy of the proposed nondisclosure agreement required to be executed by such financial institutions before discussions and an exchange of information could commence. Of these nineteen financial institutions, twelve eventually executed nondisclosure agreements and received information respecting FHI and the Bank, including a confidential information memorandum entitled "Project Bluegrass" dated October 2014 (the "2014 CIM"), which provided an overview of FHI and the Bank, in addition to the wealth of data also made available to those institutions executing the nondisclosure agreement in a virtual data room that had been established. The 2014 CIM requested that preliminary indications of interest be received with respect to a proposed Bank transaction by October 30, 2014. From the twelve financial institutions who executed the nondisclosure agreement and received due diligence information, only one written proposal was received by FHI and the Bank from one of the parties for the purchase of the Bank ("Potential Acquiror B"), along with one verbal expression of interest from another financial institution ("Potential Acquiror C").Potential Acquiror B indicated that it had retained legal and investment banking counsel, viewed the deal as very strategic and expressed its interest as "serious." Potential Acquiror B performed due diligence during the next month but, once in-depth negotiations began between Potential Acquiror B and the Bank, Potential Acquiror B withdrew from the

process due to differences in lending philosophies between the Bank and Potential Acquiror B (i.e. in the view of Potential Acquiror B the Bank had too many loans structured in a manner inconsistent with Potential Acquiror B's lending policies).

- During the latter part of November and December 2014, direct negotiations began between the Bank and Potential Acquiror C for a Lexington Branches Transaction. These negotiations resulted in a letter of intent being entered into between the Bank and Potential Acquiror C dated January 15, 2015. As the case with the currently proposed transaction, this transaction would have achieved the necessary pro forma capital levels for the resulting Louisville-based Bank to satisfy regulatory requirements. However, not long after execution of the letter of interest Potential Acquiror C withdrew from the process with the Bank in February, 2015 for reasons internal to Potential Acquiror C.

- Following continuing internal discussions among FHI, the Bank and Austin of various alternatives and the continued determination on the part of FHI and the Bank to pursue a comprehensive marketing for a Lexington Branches Transaction, ten financial institutions were again contacted, including four (by virtue of the fact that they lacked sufficient capital to buy the entire Bank) who were not among the thirty-one financial institutions contacted in connection with the 2014 CIM. Of these, five executed the requested nondisclosure agreement and executed same. The confidential information memorandum for Project Bluegrass dated March 2015 (the "2015 CIM") was circulated along with the extensive confidential information and documents posted to the secure virtual data room. The 2015 CIM requested indications of interest to be received on or before March 31, 2015, as a result of which two written indications of interest were received. The indication of interest from City Holding Company described below was accepted, City Holding Company conducted due diligence during April and May, and a Branch Purchase and Assumption Agreement ("BPA") dated as of May 29, 2015, was entered into with City National Bank of West Virginia (the "City National Transaction").

- Butler agreed that, in conjunction with the City National Transaction, he or WPB-AFB would recapitalize the Bank and serve as stalking horse bidder for a section 363 sale of the Bank Common Stock—finally providing the stability we have been looking for since I joined the Bank in 2007.

- I believe the best way to maximize the value of the FHI estate (which is the value of its Bank Common Stock) is to sell the Bank to the party that recapitalizes the Bank and provides the highest or best bid for the Bank Common Stock, whether to Butler or any other party that bids during the bankruptcy sale process. The offer we have from Butler and WPB-AFB, memorialized in the SPA (as that term is defined below), City National Transaction and REO Agreement (as that term is defined below),[5] was extensively negotiated and conducted at arm's length. I acted on behalf of FHI and

---

[5] As described below, the REO Agreement purchase price is based on the values of the subject properties as reflected on the Bank's books, and the removal of the REO assets from the Bank substantially improves capital coverage ratios required to accommodate the reorganization process.

was advised by FHI counsel throughout, and Butler likewise was represented by (separate) legal counsel.  I believe the Global Transaction would be a great outcome for FHI and the Bank[6]—and that, in my substantial interactions with Butler and his team, they have been fair in their negotiations with FHI, lived up to their promises, and acted in good faith.  That doesn't mean the sale should just go forward, though; I believe strongly in working with any party that identifies itself during the bankruptcy sale process to see if a better outcome for FHI is possible.  The agreements my team have negotiated are good for FHI, and based on the marketing we have done as well as my knowledge of the local and national banking and real estate markets, we have achieved more than fair deals that provide the starting point for our bankruptcy sale process.

- For the avoidance of doubt, I believe that each of the Global Transaction agreements that has been signed to date, including the real estate sale in the REO Agreement, was negotiated in good faith and at arm's length, and represents a good and fair outcome for FHI and its subsidiaries.  I would not allow any party, including Butler, to purchase Bank assets either for less than their value as reflected on the books of the Bank, through a closed process, or without aggressively seeking the best possible outcome for FHI stakeholders.

## PROPOSED TRANSACTIONS

30.     The proposed transactions (the "Global Transaction") accordingly include the following:

Section 363 Sale of Bank Common Stock: Subject to a competitive bidding process during the bankruptcy case and bankruptcy court approval, a sale pursuant to section 363 of the Bankruptcy Code of the Bank Common Stock to Butler (as assignee from WPB-AFB of the Senior Note) pursuant to a Stock Purchase Agreement between WPB-AFB and FHI dated June 1, 2015 (the "SPA"), a copy of which is attached hereto as **Exhibit C**;

City National Transaction (Sale of the Bank's Lexington operations):  The BPA between the Bank and City National Bank of West Virginia ("City National") contemplates the assignment by the Bank to City National of the entirety of the Bank's Lexington operations. The specific components of the BPA include the following:

- the real property owned by the Bank at its downtown Lexington location would be assigned to City National for a purchase price equal to the greater of (i) the appraised value of the property as determined by appraisals performed by an appraiser mutually agreeable to the Bank and City National or (ii) $4 million;

---

[6] As well as our regulators and the Bank's customers and employees.

- the furniture, fixtures, equipment and improvements and any other items of tangible personal property located at the Bank's Lexington offices would be assigned to City National for the net book value of such personal property as of the close of business on the closing date;

- substantially all of the loans of the Bank attributed to its Lexington offices as of the closing date would be assigned to City National for the aggregate outstanding principal and earned but unpaid interest on such loans, together with any late charges accrued thereon (and excluding any loan loss reserve or general reserve which may be associated with such loans), plus a premium equal to 1% of the aggregate principal balance of the loans;

- the deposit liabilities of the Bank would be assigned to City National in exchange for a premium equal to 5.5% of the daily average balance of the deposit liabilities (excluding for this purpose repurchase agreements, certificates of deposit and any new deposit relationship established after March 31, 2015 and in excess of $100,000); and

- certain contractual obligations of the Bank would be assigned to City National, including, without limitation, the leases respecting the two Lexington branches of the Bank not owned by the Bank.

*AFLC Preferred Share Transaction and related Bank Capital Infusion*: The proposed transaction respecting AFLC under the SPA involves the potential repurchase, redemption, conversion and/or cancellation of the outstanding AFLC Preferred Shares and AFLC Warrants.

*REO Transaction*:  Pursuant to a purchase and sale agreement between the Bank and Butler dated June 1, 2015 (the "REO Agreement"), Butler would purchase from the Bank three (3) previously foreclosed properties (OREO) held by the Bank for the aggregate cash sum of $7,102,500 (with mortgage loan financing provided thereon by the Bank in an amount equal to seventy five percent (75%) of the purchase price for a term of not less than seven (7) years at an interest rate not to exceed five percent (5%), amortized over a period of twenty (20) years).  The purchase price is equal to the values at which the three properties are held on the books of the Bank.  The purchase requires not less than $1,775,000 in cash, plus buyer's costs, provided by Butler.  The removal of these assets from the Bank substantially improves capital coverage ratios required to accommodate the reorganization process.

## RATIONALE FOR THE PETITION AND THE GLOBAL TRANSACTION

31.    Succinctly stated, the Petition is predicated upon two facts (which are outlined

below in more detail): the insolvency of the Debtor and the anemic and eroding capital structure

of the Bank.  The Petition and proposed 363 sale process of the Bank Common Stock is designed to legally formalize the irreparably insolvent status of the Debtor while firmly placing ownership of the Bank (for the best consideration that FHI can receive) in the hands of a party (whether Butler or someone else) that can adequately capitalize it and protect the interests of Bank customers and employees, so that the Bank can move forward with Louisville-only operations with a strong capital structure sufficient to satisfy regulatory requirements and presumably facilitate the lifting of the Amended Consent Order.

32.     The insolvent status of the Debtor is beyond dispute.  The Bank's value can be placed within a range from approximately $3,000,000 to $7,375,000.  For example, the total equity capital of the Bank reflected on the Bank's March 31, 2015 Consolidated Report of Condition and Income filed with the FDIC was $18,109,000.  However, reducing this sum by the claims of the AFLC Preferred Shares upon the liquidation/redemption of such shares (and accompanying AFLC Warrants) that would be required under the SPA (which claims as of June 30, 2015 will total $15,135,420) would result in Bank equity of $2,973,580.

33.     Looked at from a different perspective, **Exhibit D** attached hereto reflects a Bank valuation as of May 29, 2015 which values the Bank based upon the proposed steps under the Global Transaction, including the values for Bank assets and liabilities being proposed under the City National Transaction.  Using such a valuation method yields an estimated Bank equity capital of $7,375,000.  It is apparent that neither the sale of the Bank outside of bankruptcy (which, given the history described above, does not appear to be a feasible alternative) nor any realistic projection of the Bank's earnings performance will result in sufficient funds to service (much less satisfy) the Debtor's indebtedness (currently $40,370,775).

34.     It would further appear unlikely (if not impossible) that the Bank can ultimately survive absent the capital restructuring that would result from the consummation of the Global Transaction which includes (and fundamentally depends upon) the proposed 363 sale of Bank Common Stock.

35.     As of March 31, 2015, the Bank's Tier 1 Leverage and Total Risk-Based capital ratios were 5.60% and 8.86%, respectively, well below the respective 8% and 12% required under the Amended Consent Order.  The protracted period of time that the Bank's capital ratios have been substantially below the prescribed capital ratios under the Amended Consent Order makes the Bank susceptible to more aggressive action by the FDIC, including a FDIC Sale/Capital Raise Directive—especially if the sale process proposed in the sale motion filed contemporaneously herewith does not go forward.

36.     Based upon recently implemented banking regulations, the Bank's ability to include the AFLC Preferred Stock within its capital was reduced by forty percent (40%) as of March 31, 2015 and will be eliminated entirely (in stages) by 2018[7].  As a result, it is projected that the Bank's Tier 1 Leverage and Total Risk-Based capital ratios will decline to 4.78% and 7.76%, respectively, by March 31, 2017.

37.     Section 38 of the Federal Deposit Insurance Act ("Section 38") establishes a framework of supervisory actions for insured depository institutions that are not adequately capitalized, affording the FDIC a wide array of remedial measures it can require of banks not adequately capitalized in the form of prompt corrective action ("PCA") directives.  Pursuant to Section 38, the FDIC has defined the capital levels and measures used for determining the supervisory actions authorized under Section 38.

---

[7] Moreover, the Bank has been informed by the FDIC that the FDIC Washington office is evaluating the propriety (under FDIC regulations) of the Bank's continuing inclusion of any of the AFLC Preferred Stock within Bank capital.

38.     In 12 Code of Federal Regulations Section 325.103(b)(3), a bank is deemed "undercapitalized" if its Total Risked-Based capital ratio is less than 8% or if its Tier 1 Leverage capital ratio is less than 4%.   Accordingly, based on the projected capital ratios set forth in Paragraph 36 above, the Bank is expected to be "undercapitalized" certainly by March 31, 2017, if not sooner.

39.     As an "undercapitalized" bank, the Bank would be required to, among other things, submit a capital restoration plan to the FDIC (which the FDIC would have to approve). Failure to implement such a capital restoration plan (in any material respect) would result in the Bank being subject to the FDIC rules respecting "significantly undercapitalized" institutions. These rules grant the FDIC the power (among other things) to force the Bank to sell enough shares to become adequately capitalized.

40.     Between the protracted period of time (i.e. nearly four years) the Bank has been substantially below the capital ratios required by the Amended Consent Order, the possibility under the Amended Consent Order of a FDIC Sale/Capital Raise Directive, the anticipated erosion of the Bank's capital position in the coming months, and the broad power of the FDIC generally respecting PCA directives for banks not adequately capitalized, the Bank (absent the consummation of the components of the Global Transaction) likely faces a future of PCA directives from the FDIC that could ultimately result in the appointment of a receiver for the Bank and loss in value of the Bank Common Stock.

41.     As opposed to the bleak capital prospects of the Bank described above, it is projected that following completion of the Global Transaction, the Bank would be deemed "well-capitalized" with a Tier 1 Leverage capital ratio and Total Risk-Based capital ratio of 12.5% and 17.5%, respectively.   Accordingly, the consummation of all facets of the Global Transaction,

including the approval of a sale of the Bank Common Stock through a competitive bidding process with Butler as the stalking horse bidder, is the only realistic alternative for addressing the issues confronting FHI and the Bank.  As evidenced by the efforts on the part of FHI and the Bank for many years as outlined above, no solution to restoring the fiscal health to the Bank (and maximizing the value of the FHI estate) is available that does not include selling the Bank Common Stock.

42.     The negotiations between the Bank and Butler which have resulted in the various components of the Global Transaction have been conducted on an arms'-length, noncollusive basis, involving (among other things) separate legal counsel for both Butler and the Bank, over the nearly three years since WPB-AFB acquired the Senior Note.  Butler's forbearance from having WFB-AFB foreclose upon the Bank Common Stock under Senior Note has given the Bank the time to stabilize itself operationally (through, among other things, improving its asset quality) and conduct the exhaustive efforts outlined above to find a buyer for all, or a portion of, the Bank.  I believe Butler's support of our exhaustive marketing processes and direct communications with our regulators earned us breathing room with our regulators.  Moreover, as a result of the protracted, good faith negotiations conducted between Butler and the Bank, Butler has agreed to take the following actions in order to complete the Global Transaction:

- serve as stalking horse bidder pursuant under the SPA to acquire the Bank Common Stock;

- provide $70,000 in debtor-in-possession financing and $150,000 toward investment banker and wind-down fees under the SPA; and

- paying the Bank $7,100,000 under the REO Agreement.[8]

---

[8] The removal of the REO assets from the Bank (for a purchase price consistent with the values of such assets on the books of the Bank) substantially improves capital coverage ratios required to accommodate the reorganization process.

## FACTS IN SUPPORT OF FIRST DAY PLEADINGS

43.     Concurrently with the filing of the Petition initiating the Case, the Debtor also filed a number of First Day Pleadings.  The Debtor anticipates that the Court will conduct a hearing soon after the commencement of the Case (the "First Day Hearing") at which time the Court will hear and consider the First Day Pleadings.  The Debtor also anticipates that the Court may consider the remainder of the First Day Pleadings at a later time.  Those First Day Pleadings that the Debtor anticipates will be heard at the First Day Hearing are described below.[9]

44.     The relief sought in the First Day Pleadings is intended to:  (a) allow the Debtor to minimize disruption to its business (and to that of the Bank) to the extent necessary and appropriate to maximize the value of the Debtor's estate and (b) minimize potential adverse consequences that might otherwise result from the commencement of the Case.   More specifically, the First Day Pleadings seek relief allowing the Debtor to (i) facilitate the sale process referenced above and (ii) begin certain procedures that will provide for the efficient administration of this Case.

45.     I have reviewed each of the First Day Pleadings, including the exhibits thereto, and believe that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and, ultimately, will be integral to the Debtor's ability to preserve and maximize the value of its estate.

46.     I also believe that it is critical for the First Day Pleadings to be heard as soon as possible.  If the First Day Pleadings are not heard on an expedited basis, the Debtor may be unable to fulfill its obligations to its creditors, regulators, the Non-Debtor Subsidiaries, and other constituents.  Under such circumstances, I believe that the Debtor will not be able to operate.

---

[9] Capitalized terms used in the descriptions of the First Day Pleadings and not otherwise defined herein have the meanings given in the applicable First Day Pleadings.

Such stoppage could negatively impact the Debtor and the Non-Debtor Subsidiaries, specifically including the Bank, which could create widespread injury to the Debtor's estate, its creditors and the Non-Debtor Subsidiaries.  Accordingly, the expedited review of the First Day Pleadings is important to the continuing viability of the Debtor and the Non-Debtor Subsidiaries and therefore I believe it to be in the best interests of all interested parties.

**A.**    _Emergency Motion to Limit Certain Transfers of Equity Interests in the Debtor and Approve Related Notice Procedures_

47.    On the Petition Date the Debtor filed a motion (the "NOL Motion") seeking to restrict certain transfers of FHI's stock in order to protect and preserve valuable net operating losses ("NOLs") of $13,000,000.  In particular, the motion seeks to establish notification and hearing procedures that must be complied with before any such transfer can become effective.

48.    The Debtor's NOLs are property of its estate having the ability to be carried forward to offset future income.  However, these attributes can be jeopardized or lost altogether if a "change in ownership" were to occur for purposes of section 382 of the Internal Revenue Code.  An ownership change could be triggered if too many equity security holders or creditors[10] transfer their equity interests or claims during the Case.  Therefore, the proposed notice and hearing procedures are essential to allow the Debtor to closely monitor such transfers and to protect and preserve its NOLs.

49.    The preservation of the NOLs is also important to the consummation of FHI's sale of the Bank Common Stock.  If the NOLs are jeopardized or lost, then WPB-AFB (or other interested bidders) may not wish to proceed with or bid on the transaction, which would jeopardize the Debtor's ability to maximize the value of its assets.

---

[10] Given the limited number of creditors of the Debtor, the NOL Motion does not seek to restrict transfers of creditor claims at this time.  However, the Debtor reserves the right to seek such relief at a later date if circumstances warrant.

50.    For these reasons, I believe that the proposed procedures are necessary and will benefit the Debtor and further its reorganization efforts.

**B.**    ***The Sale Motion***

51.    On the Petition Date, FHI filed a motion (the "Sale Motion") by which it seeks permission to sell its 100% ownership of the Bank Common Stock to WPB-AFB, as the stalking horse bidder, subject to higher and better bids.

52.    FHI and the Bank have been operating under a cloud of financial and regulatory uncertainty since 2007.  For the reasons discussed in depth throughout this declaration, I believe that seeking the Court's permission to conduct the sale of the Bank Common Stock pursuant to sections 105, 363 and 365 of the Bankruptcy Code is necessary and in the best interest of the estate and FHI's creditors.  Because the Bank Common Stock represents its primary asset, FHI requires approval of the Court under section 363 to authorize the sale, out of the ordinary course of business.  More generally, the section 363 sale process is designed to provide wide notice of the sale and to generate the highest and best sale price by conducting an auction if necessary. The Sale Motion seeks approval of the section 363 sale, free and clear of interests against FHI pursuant to section 363(f) of the Bankruptcy Code.  WPB-AFB has advised that it will only purchase the Bank Common Stock if it is offered the protections customarily afforded to a stalking horse bidder in a section 363 sale, including the Bidding Protections (as defined in the Sale Motion).  It is my belief that the proposed sale is in the best interests of FHI and its creditors and is the best means of resolving the regulatory capital obligations of the Bank and FHI. Without such sale, either to WPB-AFB or another qualified bidder who makes a higher or better competing bid, FHI will not be able to maximize the value of its estate.

53.    I believe that after more than six (6) years of exploring potential alternatives outside of bankruptcy for recapitalizing the Bank, every party that reasonably could be expected

to consummate a transaction outside of bankruptcy to purchase, recapitalize or merge with the Debtor or the Bank has either been contacted directly or otherwise been made aware of the opportunity.  Accordingly, I believe that the proposed timeline in the Sale Motion (a bidding procedures hearing within 14 days of the petition date, a bid deadline of five days before the sale hearing, an auction two days before the sale hearing, and a sale hearing within 45 days of the Petition Date) is more than sufficient to complete a fair and open sale process that will maximize value for the assets.

54.    FHI negotiated the Bidding Protections at arms' length and through negotiation. Due to the nature of the Bank Common Stock, the Stalking Horse Bidder (as defined in the Sale Motion) was required to undergo a more extensive due diligence process, to investigate jointly with the Debtor what type of transaction could help it (and the Bank) escape from its long-term capitalization issues, and to expend significant sums to obtain regulatory pre-approval.  By inducing the Stalking Horse Bidder to make an offer on the Debtor's assets (as well as providing a DIP loan—knowing that it may never receive any repayment—and committing to funding wind-down expenses upon closing of the sale, which collectively are allowing the Debtor to conduct a sale process in bankruptcy), the Bidding Protections will maximize the value of the Debtor's estate.  Without the Bidding Protections, the Stalking Horse Bidder would not have been willing to spend the substantial time and resources required to complete the necessary due diligence and obtain regulatory pre-approval for the transaction. There are safeguards in place to ensure that the Debtor receives the highest and best price for the shares of Bank Common Stock because the sale is taking place through a public auction.  The Bidding Protections induced the stalking horse bid and facilitated the sales process by which higher and better bids can be received.  Further, FHI agreed to the breakup free after reviewing and understanding the breakup

fees approved in other cases, concluding that 3% of the purchase price is very common in the marketplace.

55.     For the reasons listed above, I believe that approval of the Sale Motion is a necessary step towards satisfying the best interests of FHI's estate and its creditors.

**C.**     ***Motions and Applications Relating to Professionals***

56.     The retention of certain chapter 11 professionals is essential to the Debtor's efforts in the Case to preserve value for its estate.  Accordingly, the Debtor has sought or will seek to retain various professionals in the Case.  These professionals include: (a) Stoll Keenon Ogden PLLC ("SKO") as bankruptcy counsel; Austin Associates, LLC as financial advisor; and Mountjoy Chilton Medley as accountant.  I believe that (i) the foregoing professionals are well qualified to provide the services contemplated by their various retention applications, (ii) the services to be provided by the foregoing professionals are necessary for the success of the Case, and (iii) the foregoing professionals will coordinate their services to avoid any duplication of effort.  The Debtor may find it necessary to seek to retain additional professionals as the Case progresses.

**D.**     ***Motion for Entry of Interim and Final Order Authorizing Postpetition Borrowing and Granting Liens and Superpriority Administrative Expense Status to Lender***

57.     The Debtor cannot obtain unsecured postpetition credit and cannot otherwise fund this bankruptcy and (as set forth in the schedules filed herein) the Debtor has no cash.[11]  The Debtor's source of income is dividends from its ownership of the Bank Common Stock.  As described above, the MOU prohibits FHI from taking dividends or other payments from the Bank without approval from the Federal Reserve Bank.  Likewise, the Amended Consent Order restricts the Bank's ability to pay dividends to FHI.  I asked WPB-AFB if it would provide

---

[11] The approximately $11,737.62 of the Debtor's remaining cash has been transferred to proposed counsel's escrow account and is earmarked for the payment of administrative expenses in this case.

postpetition financing without a superpriority claim or lien on the Bank Common Stock, and WPB-AFB responded in the negative.  Given the debt structure of the Debtor as compared to its assets, the Debtor will be unable to obtain postpetition financing without the relief and authorization requested in the Motion for Entry of Interim and Final Order Authorizing Postpetition Borrowing and Granting Liens and Superpriority Administrative Status to Lender (the "DIP Motion").

58.     Without postpetition financing, the Debtor will be irreparably harmed due to its inability to fund its bankruptcy--meaning the Global Transaction will not occur.  As mentioned above, it is my belief that the proposed sale is in the best interests of FHI and its creditors and is the best means of resolving the regulatory capital obligations of the Bank and FHI.  I believe the terms of the DIP financing are reasonable and pragmatic, and both parties agreed, for the sake of efficiency, to simply adopt the existing interest rates from the Senior Note, which I believe is fair to FHI.

59.     I believe the grant of a junior lien on the Bank Common Stock and a superpriority administrative expense claim is reasonable for the financing contemplated in the DIP Motion.

Dated: June 16, 2015

*/s/ Barry C. Brauch*
Barry C. Brauch

Respectfully submitted,

STOLL KEENON OGDEN PLLC

/s/ Adam M. Back
Adam M. Back
Jessica L. Haurylko
300 West Vine Street, Suite 2100
Lexington, Kentucky 40507
Telephone: (859) 231-3000
Facsimile: (859) 253-1093
E-mail: adam.back@skofirm.com
          jessica.haurylko@skofirm.com

*Proposed Counsel for the Debtor and
Debtor in Possession*

115449.152190/4393396.15