**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| FINANCIAL HOLDINGS, INC., | ) | Case No. 15-51187 |
| | ) | |
| DEBTOR. | ) | Chapter 11 |
| | ) | |

**MOTION FOR AN ORDER:  (I) APPROVING (A) BIDDING PROCEDURES,
(B) BIDDING PROTECTIONS, (C) WPB-AFB, LLC AS STALKING HORSE BIDDER,
(D) THE FORM AND MANNER OF THE NOTICE OF THE SALE OF THE
BANK COMMON STOCK, AND (E) OTHER RELATED RELIEF; AND
(II) AUTHORIZING AND APPROVING THE SALE OF THE BANK COMMON
STOCK FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES**

Comes Financial Holdings, Inc., as debtor and debtor in possession ("FHI" or the

"Debtor"), and, pursuant to sections 105(a), 363(b), (f), and (m) of title 11 of the United States

Code (the "Bankruptcy Code") and Rules 2002 and 6004(h) of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") and all other applicable law, respectfully requests entry of

an Order (I) Approving (A) Bidding Procedures, (B) Bidding Protections, (C) WPB-AFB, LLC

as Stalking Horse Bidder, (D) the Form and Manner of the Notice of the Sale of the Bank

Common Stock, and (E) Other Related Relief; and (II) Authorizing and Approving the Sale of

the Bank Common Stock Free and Clear of Liens, Claims and Encumbrances (the "Sale

Motion").[1] In support of this Sale Motion, the Debtor incorporates by reference the statements

contained in the Declaration of Barry C. Brauch in Support of First Day Pleadings (the "Brauch

Declaration") filed contemporaneously herewith. In further support of the Sale Motion, the

Debtor respectfully states as follows:

---

[1] All capitalized terms not otherwise defined herein shall have the meaning attributed to them in the Stock Purchase
Agreement dated as of June 1, 2015, between the Debtor and WPB-AFB, LLC (the "SPA") or the Brauch
Declaration.

## FILING AND JURISDICTION

1.      On June 16, 2015 (the "Petition Date"), FHI filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Kentucky, Lexington Division (the "Bankruptcy Court").

2.      FHI is continuing in possession of its property and is managing its business and affairs as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b) and may be determined by this Court. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      No trustee, examiner or official committee of unsecured creditors has been appointed in this case.

## PRELIMINARY STATEMENT

5.      The Debtor, in the face of insurmountable pending regulatory and financial obligations, has made extraordinary efforts over the past six years to seek new capital sources or sell all or a portion of the Bank. The Debtor's principal asset is its 100% stock ownership interest in the Bank (the "Bank Common Stock" or the "Shares"), and the Bank has yet to achieve the capital ratios set by regulators to be achieved by December 31, 2012 (in the amended consent order between it, the Federal Deposit Insurance Corporation ("FDIC") and the Kentucky Department of Financial Institutions ("KDFI"). Further, any realistic valuation of the Bank results in a value substantially less than the balance owed under the Senior Note and a fraction of the balance owed collectively between the Senior Note and the Debenture.  The Debtor conducted numerous marketing processes, described in detail in the Brauch Declaration, with this proposed sale (the "Sale") of the Bank Common Stock (along with two other capital-providing transactions to be closed simultaneously with the Sale, namely, the sale by the Bank

and its subsidiary of branches and real estate—collectively, with the Sale, the "Global Transaction"). The Global Transaction is the first viable solution to the Bank's chronic capitalization problem (and thereby a means of maximizing the value of the Debtor's Bank Common Stock).

6.      By this Sale Motion, the Debtor seeks authority to conduct a sale process that will allow for competitive bidding, culminating with the sale of the Bank Common Stock to the highest or otherwise best qualified bidder. The Sale is the only viable alternative that the Debtor has been able to identify after years of scouring the market for recapitalization and sales opportunities.[2]  After diligent and comprehensive efforts, and in light of the current regulatory and financial challenges facing the Debtor, the Sale represents the best and most viable alternative for maximizing the value of the Debtor and the Bank, and is in the best interests of the Debtor and its estate.

## **BACKGROUND**

### A.      **Capital Structure**

7.      The Debtor is one bank holding company, organized under the laws of the Commonwealth of Kentucky, that owns one hundred percent (100%) of the common stock of two subsidiaries, neither of which is a debtor in this case: (i) American Founders Bank, Inc. (the "Bank") and (ii) American Founders Statutory Trust I (the "Statutory Trust"). The Bank, in turn, owns one hundred percent (100%) of the voting common stock of American Founders Loan Corporation ("AFLC" and together with the Bank and the Statutory Trust, the "Non-Debtor Subsidiaries").

---

[2] For more detail, see "RATIONALE FOR THE PETITION AND THE GLOBAL TRANSACTION" in the Brauch Declaration.

8.    The Bank currently operates five (5) branches in the Commonwealth of Kentucky: three (3) in Lexington and two (2) in Louisville. As of the Petition Date, the Bank had approximately 8,168 customers and employed a total of 53 employees.

9.    As of June 4, 2015, the Debtor had outstanding secured indebtedness of at least $14,352,488 under that certain promissory note and related security documents (the "Senior Note"). The Senior Note is held by WPB-AFB, LLC ("WPB-AFB" or, in its capacity as the purchaser under the SPA, the "Stalking Horse Bidder")[3], through an assignment from U.S. Bank and is secured by FHI's 100% ownership interest in the Bank. The Bank Common Stock is in the possession of WPB-AFB.  A copy of the Senior Note, the assignment from U.S. Bank, a stock power assignment and stock pledge agreement are attached to the Brauch Declaration as **Exhibit B** thereto.[4]  The Senior Note has continually been in default since 2010 and the most recent forbearance agreement between the parties expired on June 15, 2015.

10.    The sole member and principal of WPB-AFB is William P. Butler ("Butler"). Butler was an original FHI shareholder upon the formation of FHI and currently holds (individually and through a partnership controlled by Butler) 15.05% of the common stock of FHI.  Butler is also a holder of preferred shares and common stock warrants in the Debtor's nondebtor subsidiary AFLC, as well as a director of AFLC (and as such, is likely an "insider" as that term is defined in the Bankruptcy Code).  Butler is the counterparty to the REO Agreement described in the Brauch Declaration, by which Butler will purchase real estate from the Bank,

---

[3] William P. Butler, principal of WPB-AFB, is one of the largest shareholders of FHI and is a holder of $1,000,000 of the Series B Non-Cumulative Non-Voting Perpetual Preferred Stock issued by AFLC.

[4] Neither the Senior Lender nor the Statutory Trust (as that term is defined below) are required at this time to file a proof of claim.  With respect to the Senior Lender's possession of the Bank Common Stock, the Senior Lender shall be prepared to provide a proffer or testimony of such possession at the sale hearing if requested by the court or a party in interest.

with the more than $7 million purchase price contributing to the Bank's recapitalization as part of the Global Transaction to be closed on the same day as the Sale.

11.      In April, 2006 the Statutory Trust issued $20.0 million of trust preferred securities (the "TruPS") to investors in a closed pooled private offering of 20,000 securities with liquidation amount of $1,000 per share.   On the same day, FHI issued $20.6 million of Subordinated Debentures (the "Debentures") to the Statutory Trust in exchange for ownership of all of the common equity of the Statutory Trust and the proceeds of the TruPS sold by the Statutory Trust.

12.      Wilmington Trust is the trustee of the Statutory Trust and the indenture trustee for the Debentures. FHI is not considered the primary beneficiary of the Statutory Trust, and accordingly the Statutory Trust is not consolidated in FHI's financial statements.

13.      In addition to FHI's default under the Senior Note, FHI has been in default due to its failure to pay scheduled interest payments on the Debentures since September 15, 2013.

14.      Thus, as of the Petition Date, FHI also had outstanding unsecured indebtedness of $26,278,844 under the Debentures issued to the Statutory Trust.

**B.      Regulatory Concerns**[5]

15.      The Debtor and the Bank are highly regulated institutions.   The Bank's primary regulators are the FDIC and KDFI.   The Debtor's primary regulator is the Board of Governors of the Federal Reserve Board (the "FRB").   Unless context otherwise requires, references herein to the "Regulators" shall mean refer to any or all of the regulatory entities listed above, as applicable.

16.      Prior to 2007, the Bank, like many financial institutions during that period, engaged in a number of high risk lending policies, which left the Bank with a significant

---

[5] These regulatory issues are discussed in more detail in the Brauch Declaration.

concentration of troubled assets. As a result, on February 22, 2007 (as amended on September 6, 2007), the Bank consented to an Order to Cease and Desist issued by the FDIC and the KDFI (the "Cease and Desist Order"). The Cease and Desist Order required, among other things, that the Bank achieve and maintain a Tier 1 capital ratio at a minimum of eight percent (8%).

17.    On August 20, 2007, FHI entered into a Memorandum of Understanding (the "MOU") with the Federal Reserve Bank of St. Louis. Under the MOU, FHI is required to assist the Bank with certain regulatory matters and mandates FRB approval before FHI is authorized to declare corporate dividends, make payments to any insiders, pay interest on the Debentures, redeem stock, or incur debt. The MOU is still in effect.

18.    On October 12, 2010, the Cease and Desist Order was terminated and the Bank entered into a consent order with the FDIC and the KDFI (the "Original Consent Order"), which eliminated many of the requirements of the Cease and Desist Order. The Original Consent Order required the Bank to, among other things: (i) maintain its Total Risk Based capital ratio at a minimum of 12.0%; (ii) maintain its Tier 1 leverage capital ratio at a minimum of 8%; and (iii) restrict dividend payments to FHI. On October 31, 2012, the consent order was amended (the "Amended Consent Order") to include a deadline of December 31, 2012, by which the Bank must meet the capital ratios set forth therein or the Regulators could direct the Bank to "develop, adopt and implement a written plan to sell or merge itself into another federally insured financial institution or to otherwise obtain sufficient capital investment into the Bank to fully meet" the capital ratio requirements.

19.    As a result of certain branch sales and closures, the Bank was able to convince the Regulators, in early 2013, not to take any additional enforcement actions under the Amended Consent Order. As of March 31, 2015, the Bank's Tier 1 Leverage and Total Risk-Based capital

ratios were 5.60% and 8.86%, respectively, well below the respective 8% and 12% required under the Amended Consent Order entered into by the Bank, the Federal Deposit Insurance Corporation, and the Kentucky Department of Financial Institutions on October 31, 2012. Based upon newly implemented banking regulations, it is projected that the Bank's Tier 1 Leverage and Total Risk-Based capital ratios will decline without drastic action by the Bank.

**C.    Sales and Marketing Efforts**

20.    Over the last six years, FHI has made extraordinary efforts to raise additional capital or sell all or a portion of the Bank.

21.    In early 2009, FHI retained Hexagon Capital to assist in raising capital that would be used to enable the Bank in bringing its capital ratios into regulatory compliance in accordance with the Cease and Desist Order. Hexagon contacted approximately twenty institutional investors but the process did not result in the receipt of any indications of interest for a Bank capital infusion. In late 2010, with heightened urgency due to the Amended Consent Order, FHI retained The Chicago Corporation ("TCC") to serve as financial advisor in connection with a recapitalization or sale of FHI and/or the Bank. TCC prepared a confidential information memorandum (the "2010 CIM") containing background, financial and regulatory information about FHI and the Bank and certain financial projections. Beginning in early 2011, TCC contacted over ninety institutional or accredited investors, with a primary goal of raising $35 million in capital for the Bank. Seventeen prospective investors executed nondisclosure agreements and reviewed the 2010 CIM. All of these parties subsequently declined to make a proposal to invest in the Bank.

22.    In the fall of 2011, TCC contacted thirty-five potential strategic buyers, primarily consisting of other banking organizations. This process did not result in any proposals for the purchase of FHI or the Bank.

23.     FHI continued to solicit organizations and investors with respect to a sale or recapitalization of FHI or the Bank, including branch sale transactions.  In addition to due diligence (chiefly of the Bank's loan portfolio) conducted by several bank holding companies during 2012 and 2013, the most substantive negotiations for a transaction involving the Bank prior to the efforts in late 2014 described below were negotiations during 2012 with a central Kentucky-based financial institution ("Potential Acquiror A") for a transaction substantially similar to the currently proposed transactions for FHI and the Bank, namely, a proposed Section 363 sale of the Bank Common Stock by FHI accompanied by a sale by the Bank of its Lexington, Kentucky operations (a "Lexington Branches Transaction").  A confidentiality agreement was entered into with Potential Acquiror A on February 3, 2012 and various drafts of a branch purchase and assumption agreement were exchanged between Potential Acquiror A and the Bank, along with extensive due diligence conducted by Potential Acquiror A.  Similar to the currently proposed transaction that will be described below, that prior attempted transaction contemplated (1) the assignment by the Bank to Potential Acquiror A of the Bank's real estate located in downtown Lexington, as well as all personal property owned by the Bank, in exchange for a cash sum, (2) the assignment of substantially all of the loans of the Bank attributed to its Lexington, Kentucky banking offices and (3) the assignment to Potential Acquiror A by the Bank of the Bank's deposit liabilities in exchange for a premium on such deposit liabilities.  Due to certain deadlocks on deal points which arose in the negotiations the overall consideration to be received by the Bank was inadequate to place the Bank in a sufficient capital position, and accordingly the efforts by the Bank and Potential Acquiror A to enter a Branch Purchase and Assumption Agreement transaction were terminated in the first quarter of 2013.

24.    In 2012, WPB-AFB acquired the Senior Note.    Butler and WPB-AFB have supported the subsequent efforts described below of FHI and the Bank to seek acquirers or new capital sources.  Butler's willingness to serve as a stalking horse bidder should the need arise and forbearance from having WFB-AFB foreclose upon the Bank Common Stock given the longstanding default, as well as his direct communications with our regulators, bought the Debtor the breathing room to conduct the thorough marketing process described below over the past few years (and for the Bank to stabilize itself operationally by, among other things, improving asset quality)—without having the bank seized or forced into a fire sale.

25.    In October, 2012, FHI retained Austin Associates, LLC ("Austin") to provide general financial advisory services in connection with its recapitalization efforts and to evaluate various proposed transaction alternatives, including evaluation of a transaction involving a section 363 sale of the Bank Common Stock along with a Lexington Branches Transaction.  In connection with this engagement, Austin created financial forecasts respecting FHI and the Bank, prepared an analysis of AFLC's capital structure and assessed the present value of liquidating the AFLC Preferred Shares, projected the future capital needs of the Bank to achieve a satisfactory capital position, conducted an internal rate of return analysis of the Bank, compiled data with respect to all section 363 sales respecting banks and bank holding companies in the United States since 2010, and prepared a list of all financial institution mergers and acquisitions in the Midwest region of the United States during the prior two years.  As a result of the aforedescribed work by Austin and the consideration of same by FHI and Bank management (which continued throughout 2013 and the first half of 2014), by way of another engagement letter dated September 3, 2014, FHI and the Bank once again engaged Austin (as well as Investment Bank Services), to serve as the exclusive financial advisor to FHI and the Bank for

purposes of pursuing a bankruptcy filing and associated section 363 sale on the part of FHI or a sale of the Bank.

26.     In late 2014, Austin contacted thirty-one organizations which, based on geographic location and Austin's analysis of the respective financial capacity of such organizations, were viewed as possible candidates for the purchase of the Bank.  Of these thirty-one financial institutions, nineteen requested a copy of the proposed nondisclosure agreement required to be executed by such financial institutions before discussions and an exchange of information could commence.   Of these nineteen financial institutions, twelve eventually executed nondisclosure agreements and received information respecting FHI and the Bank, including a confidential information memorandum entitled "Project Bluegrass" dated October 2014 (the "2014 CIM"), which provided an overview of FHI and the Bank, in addition to the wealth of data also made available to those institutions executing the nondisclosure agreement in a virtual data room that had been established.   The 2014 CIM requested that preliminary indications of interest be received with respect to a proposed Bank transaction by October 30, 2014.   From the twelve financial institutions who executed the nondisclosure agreement and received due diligence information, only one written proposal was received by FHI and the Bank from one of the parties for the purchase of the Bank ("Potential Acquiror B"), along with one verbal expression of interest from another financial institution ("Potential Acquiror C").Potential Acquiror B indicated that it had retained legal and investment banking counsel, viewed the deal as very strategic and expressed its interest as "serious."   Potential Acquiror B performed due diligence during the next month but, once in-depth negotiations began between Potential Acquiror B and the Bank, Potential Acquiror B withdrew from the process due to differences in lending philosophies between the Bank and Potential Acquiror B (i.e. in the view of Potential

Acquiror B the Bank had too many loans structured in a manner inconsistent with Potential

Acquiror B's lending policies).

27.     During the latter part of November and December 2014, direct negotiations began

between the Bank and Potential Acquiror C for a Lexington Branches Transaction.   These

negotiations resulted in a letter of intent being entered into between the Bank and Potential

Acquiror C dated January 15, 2015.   As the case with the currently proposed transaction, this

transaction would have achieved the necessary pro forma capital levels for the resulting

Louisville-based Bank to satisfy regulatory requirements.   However, not long after execution of

the letter of interest Potential Acquiror C withdrew from the process with the Bank in February,

2015 for reasons internal to Potential Acquiror C.

28.     Following continuing internal discussions among FHI, the Bank and Austin of

various alternatives and the continued determination on the part of FHI and the Bank to pursue a

comprehensive marketing for a Lexington Branches Transaction, ten financial institutions were

again contacted, including four (by virtue of the fact that they lacked sufficient capital to buy the

entire Bank) who were not among the thirty-one financial institutions contacted in connection

with the 2014 CIM.  Of these, five executed the requested nondisclosure agreement and executed

same.  The confidential information memorandum for Project Bluegrass dated March 2015 (the

"2015 CIM") was circulated along with the extensive confidential information and documents

posted to the secure virtual data room.   The 2015 CIM requested indications of interest to be

received on or before March 31, 2015, as a result of which two written indications of interest

were received.   The indication of interest from City Holding Company described below was

accepted, City Holding Company conducted due diligence during April and May, and a Branch

Purchase and Assumption Agreement ("BPA") dated as of May 29, 2015, was entered into with

City National Bank of West Virginia (the "City National Transaction").

29.     Butler agreed that, in conjunction with the City National Transaction, he or WPB-

AFB would recapitalize the Bank and serve as stalking horse bidder for a section 363 sale of the

Bank Common Stock.

**D.     Key Terms of the SPA**

30.     The Stalking Horse Bidder and the Debtor have agreed to the key terms of the

proposed Sale and have executed the SPA, which remains subject to the Bankruptcy Court's

approval. A copy of the SPA is attached as **Exhibit C** to the Brauch Declaration and is fully

incorporated by reference herein.[6]  Pursuant to the SPA, the Debtor will sell the Bank Common

Stock to the Stalking Horse Bidder free and clear of all liens, claims, and encumbrances, and in

satisfaction of the secured claim held by the Stalking Horse Bidder, in exchange for a credit bid

equal to the sum of all obligations owed by the Debtor under the Senior Secured Loan and the

payment of a Wind Down Amount (as defined in the SPA).[7]  The Sale is also subject to a

marketing period and the receipt of higher and better offers, and the    sale is also subject to

approval of the Regulators. In addition, the Stalking Horse Bidder seeks certain protections in the

Bidding Procedures and Auction (as defined below) in the event of a third party topping bid or

termination.

31.     Pursuant to Section 5.10 of the SPA, the Court must enter an Order approving the

Bidding Procedures no later than thirty-five (35) days following the Petition Date; and the Court

must also conduct a Sale Hearing no later than sixty (60) days following the Petition Date.  As

---

[6] In addition, the Debtor and Purchaser agree that the proposed sale order shall provide that "[i]n the event that each
of the directors and officers of the Bank and its subsidiaries do not enter into the letter agreement described in
section 7.2(d) of the SPA, and the Purchaser waives such closing condition, the effect of such waiver shall be that
Purchaser is no longer bound by section 5.5 ("Indemnification; D&O Insurance") of the SPA."

[7] The Debtor and Purchaser further agree that the initial stalking horse Purchase Price shall not exceed $14,500,000.

such, the Debtor proposes the following timeline in connection with the relief sought in this

Motion:

| EVENT | DATE |
|---|---|
| Bidding Procedures Hearing[8] | Within 14 days of Petition Date |
| Bid Deadline | 5 days before Sale Hearing |
| Auction (if required) | 2 days before Sale Hearing |
| Sale Hearing | Within 45 days of Petition Date |

32.    The Debtor believes that after more than six (6) years of exploring potential

alternatives for recapitalizing the Bank, every party that reasonably could be expected to

consummate a transaction to purchase, recapitalize or merge with the Debtor or the Bank has

either been contacted directly or otherwise been made aware of the opportunity. Regardless, the

relief requested herein and timeline allow for local and national publication of notice of the sale

process, in addition to direct notice to all entities known to have expressed an interest in a

transaction with respect to the Debtor, the Bank or the Bank Common Stock.  Accordingly, the

Debtor believes that the proposed timeline is more than sufficient to complete a fair and open

sale process that will maximize value for the assets.

## **RELIEF REQUESTED**

33.    By this Sale Motion, the Debtor seeks entry of the "Bidding Procedures Order,"

substantially in the form attached hereto as **Exhibit A**, which (i) approves the Bidding

Procedures; (ii) approves certain bidding protections, including the Bidding Protections, the

Minimum Overbid, and the bidding increments described below; (iii) approves WPB-AFB as the

Stalking Horse Bidder; (iv) approves the form and manner of the Sale Notice and the Publication

Notice; and (v) grants related relief.

---

[8] Contemporaneously herewith, the Debtor has filed a separate motion to shorten notice and to set the Bidding Procedures Hearing for a date to be set by the Bankruptcy Court.

34.    Further, by this Sale Motion, the Debtor requests that the Court schedule a Sale

Hearing within forty-five (45) days of the Petition Date.   At the Sale Hearing, the Debtor

requests entry of the "Sale Order," substantially in the form attached hereto as **Exhibit E**, which

(i) approves the SPA or the Competing Agreement (as defined in the Bidding Procedures), as

applicable; (ii) names WPB-AFB or some other party as the Successful Bidder; (iii) confirms

that the sale of the Bank Common Stock to WPB-AFB or another Successful Bidder shall be free

and clear of all liens, claims and encumbrances; (iv) waives the fourteen (14) day stay of

Bankruptcy Rule 6004(h); and (v) grants related relief.

## BASIS FOR RELIEF

**A.    Bidding Procedures**

35.    The Bidding Procedures are designed to maximize value for the Debtor's estate.

The key terms of the proposed Bidding Procedures are as follows:[9]

---

### A.    Documentation Necessary for Qualification as an Overbidder:

In order to be qualified to receive any confidential information from the Debtor or
the Bank, to submit an Initial Overbid (as defined below), and to participate in an
auction with respect to the Bank Common Stock (the "Auction"), a potential
bidder (each, an "Overbidder") must submit each of the following to the Debtor
on a timely basis:

(1)    An executed confidentiality agreement which shall inure to the benefit of
the Successful Bidder (as defined below); and

(2)    Current audited financial statements and the latest unaudited financial
statements of the Overbidder or, if the Overbidder is an entity formed for the
purpose of acquiring the Bank Common Stock, current audited financial
statements and the latest unaudited financial statements of the equity holders or
sponsors of the Overbidder who will guarantee the obligations of the Overbidder,
or such other form of financial disclosure as the Debtor may require, in each case
that will allow the Debtor to make a reasonable determination that the Overbidder

---

[9] The proposed Bidding Procedures are attached hereto as **Exhibit B**.  In the event of any conflict between the
Bidding Procedures and this summary, the Bidding Procedures shall control.  Capitalized terms used in this
summary have the meaning ascribed to them in the Bidding Procedures.

has the capability to (A) consummate the Sale for a price not less than the Minimum Overbid (as defined below), (B) effect the recapitalization of the Bank required by the Regulators (the "Capital Commitment"), and (C) obtain all necessary regulatory approvals with respect to the ownership of the Bank Common Stock and operation of the Bank on a timely basis.

**B.      Provisions Governing Qualification of Overbids**

In order to participate at the Auction, an Overbidder must submit the following documents to the Notice Parties so as to be received by the Bid Deadline (each as defined below) and meet the following conditions:

(1)      A proposed purchase agreement (the "Competing Agreement"), executed by the Overbidder in a form substantially similar to that set forth in the Stalking Horse Agreement, together with a redlined, marked copy showing all changes between the Competing Agreement and the Stalking Horse Agreement, which Competing Agreement provides for a cash purchase price that exceeds the Purchase Price by at least the amount of the Bidding Protections  plus the $150,000 Wind Down Amount (collectively, the "Minimum Overbid"). The Competing Agreement shall also:  (A) provide for the recapitalization of the Bank through an equity investment of not less than the amount of the Capital Commitment in a form and on terms acceptable to the applicable Governmental Authorities; (B) provide for the assumption and payment of the Wind Down Amount; (C) remains irrevocable until the closing of the Sale; (D) disclaims any right of Overbidder to receive a fee analogous to the Bidding Protections or to compensation under Bankruptcy Code Section 503(b) for making a substantial contribution; and (E) contains a proposed closing date that is not later than the earlier of (i) one hundred and eighty (180) days after the date of the Competing Agreement and (ii) five (5) days after receipt of regulatory approval for the proposed transaction (the "Outside Date").

(2)      A cashier's check made payable to the order of the Debtor in the amount of ten percent (10%) of the purchase price contained in the Competing Agreement (the "Overbidder's Deposit"), which if the Overbidder is the Successful Bidder (as defined below), will be retained by the Debtor as a non-refundable good faith deposit for application against the purchase price at the closing of the Sale, or, if the Overbidder is not the Successful Bidder, will be returned to the Overbidder in accordance with these Bidding Procedures.  The Overbidder's Deposit provided by each Overbidder shall not earn interest.

(3)      Provide adequate evidence, based upon the Debtor's business judgment, that the Overbidder has the financial ability to pay the purchase price and the Capital Commitment set forth in the Competing Agreement.

(4)      Terms and conditions that are, in the aggregate, higher and better than the terms and conditions of the Stalking Horse Agreement, as determined by the Debtor; provided, however, that if such terms and conditions include regulatory

contingencies, such contingencies shall not disqualify a Competing Agreement, but shall be taken into consideration when such Competing Agreement is evaluated; provided further, however, that such terms and conditions cannot include contingencies related to due diligence, financing, bid protections, expense reimbursements or corporate consents or approvals.

(5)     Provide adequate evidence, based upon the Debtor's business judgment, that the Overbidder is capable and qualified of unconditionally performing all obligations under the Competing Agreement, including, but not limited to, adequate evidence that the Overbidder has or is capable of obtaining all regulatory approvals required to close the Sale not later than the Outside Date.

(6)     Provide adequate evidence, in a form satisfactory to the Debtor, that establishes the good faith of the Overbidder within the meaning of Section 363(m) of the Bankruptcy Code.

A bid received from an Overbidder that meets the criteria set forth above, as determined in by the Debtor in its sole discretion, will be considered a "Qualified Bid." The Stalking Horse Purchaser and any Overbidder that submits a Qualified Bid (an "Initial Overbid") shall be deemed a "Qualified Bidder" and may bid for the Bank Common Stock at the Auction. Any entity that fails to submit a timely conforming Qualified Bid shall be disqualified from bidding for the Bank Common Stock at the Auction. Each Overbidder that submits a Qualified Bid shall be deemed to acknowledge and represent that (i) it has had an opportunity to conduct any and all due diligence regarding the Debtor, the Bank, and the Bank Common Stock prior to making any bids; (ii) it has relied solely upon its own independent review, investigation and/or inspection of any documents in making its bid; and (iii) it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Debtor, the Bank, the Bank Common Stock, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures or, as to the Successful Bidder, the agreement entered into by such Successful Bidder with the Debtor providing for the Successful Bid.

## C.     **Bid Deadline**

An Overbidder that desires to make an Initial Overbid shall deliver written copies of its bid to the following parties (the "Notice Parties") so as to be received no later than a date set by the Bidding Procedures Order (the "Bid Deadline"): (i) counsel to the Debtor: Stoll Keenon Ogden PLLC, 300 West Vine Street, Suite 2100, Lexington, Kentucky 40507 (Attn: Adam M. Back, adam.back@skofirm.com and Jessica L. Haurylko, jessica.haurylko@skofirm.com); (ii) financial advisor to the Debtor: Austin Associates, LLC, 7205 W. Central Ave., Toledo, Ohio 43617 (Attn: Craig Mancinotti, craig.mancinotti@austinassociates.com); (iii) counsel to Wilmington Trust Company, in its capacity as (a) Institutional Trustee and Delaware Trustee

of the American Founders Statutory Trust I and (b) Debenture Trustee for the Fixed/Floating Rate Junior Subordinated Deferrable Interest Debentures Due 2036, Kilpatrick, Townsend & Stockton, LLP, 1100 Peachtree Street NE, Suite 1100, Atlanta, Georgia 30309 (Attn: Robin S. Rahman, rrahman@kilpatricktownsend.com and Todd C. Meyers, tmeyers@kilpatricktownsend.com); (iv) counsel to any official committee formed in this case; and (v) counsel to the Stalking Horse Purchaser: Dinsmore & Shohl, LLP, 255 East Fifth Street, Suite 1900, Cincinnati, Ohio 45202 (Attn: Michael G. Dailey, michael.dailey@dinsmore.com, Uday Gorrepati, uday.gorrepati@dinsmore.com, and Susan Zaunbrecher, susan.zaunbrecher@dinsmore.com).

### D.    No Competing Bid

If no timely Qualified Bid is submitted, the Debtor shall not conduct the Auction, the Stalking Horse Purchaser will be named the Successful Bidder (as defined below) following the Bid Deadline and the Debtor shall request at the Sale Hearing that the Bankruptcy Court approve the Stalking Horse Agreement, including the sale of the Bank Common Stock to the Stalking Horse Purchaser, and request that the Sale Order shall be immediately effective upon entry.

### E.    Auction Procedures

If one or more timely Qualified Bids is received, the Debtor will conduct the auction of the Bank Common Stock at the offices of Stoll Keenon Ogden PLLC, 300 West Vine Street, Suite 2100, Lexington, Kentucky, or at such other location as shall be identified in a notice filed with the Bankruptcy Court at least 24 hours before the Auction, in which the Stalking Horse Purchaser and all other Qualified Bidders may participate.  The Auction shall be governed by the following procedures:

(1)    The Auction will be conducted openly and all creditors will be permitted to attend; provided, however, that only Qualified Bidders may participate in the Auction.

(2)    Each Qualified Bidder shall be required to confirm that (i) it has not engaged in any collusion with respect to the bidding or the Sale and (ii) that it consents to the jurisdiction of the Bankruptcy Court in regards to all matters related to the Auction or the Sale of the Bank Common Stock.

(3)    For the purpose of comparing bids, each bid by a Qualified Bidder (other than the Stalking Horse Purchaser) shall be automatically reduced by an amount equal to the Bidding Protections.

(4)    Bidding will commence at the amount of the highest bid submitted by a Qualified Bidder, as determined by the Debtor in its sole discretion.

(5)     Each subsequent bid shall be in increments of no less than $100,000.00 above the immediately preceding bid, and the Debtor will evaluate each such bid in its sole discretion.

(6)     The Stalking Horse Purchaser shall have the right, but not the obligation, to match bids made by any other Qualified Bidder and, in such event, the Stalking Horse Purchaser's matching bid shall be deemed the highest and best bid for the Bank Common Stock.

(7)     The Auction shall be conducted openly and each bidder will be informed of the terms of the previous bid determined by the Debtor, in its sole discretion, to have been the highest and otherwise best bid.

(8)     The bidding at the Auction shall be transcribed.

(9)     The Stalking Horse Purchaser shall have the right to credit bid any and all amounts outstanding under the Senior Secured Loan plus the $150,000 Wind Down Amount and the DIP Loan.  For the avoidance of doubt, no other Qualified Bidder shall have the right to credit bid at the Auction.

(10)    The Auction shall continue until there is only one bid that the Debtor determines in its sole discretion, subject to Bankruptcy Court approval, is the highest or otherwise best bid (the "Successful Bid") from among the bids submitted by the Qualified Bidders at the Auction.  The bidder submitting such Successful Bid shall become the "Successful Bidder") and shall have such rights and responsibilities as the purchaser, as set forth in the Competing Agreement or the Stalking Horse Agreement, as applicable, with the amount of the Successful Bidder's final bid substituted as the purchase price in the applicable agreement.

(11)    The Debtor, at the conclusion of the Auction, shall also determine and identify the second highest or otherwise best Qualified Bid (the "Back-up Bid") and the Qualified Bidder submitting such bid (the "Back-up Bidder").  If the Successful Bid is terminated or fails to close within the time period specified in the Successful Bid, the Debtor shall be authorized, but not required, to consummate the sale transaction with the Back-up Bidder.  The Back-up Bid shall remain open until the earlier of (i) the first (1st) business day following the consummation of the Sale and (ii) the twentieth (20th) day after entry of the Sale Order.

(12)    In addition to the procedures outlined above, the Debtor may employ and announce at the Auction other procedural rules that are reasonable under the circumstances for conducting the Auction; provided, however, that such rules are (i) not materially inconsistent with these Bidding Procedures and (ii) disclosed to each Qualified Bidder at the Auction.

Within one (1) business day after conclusion of the Auction, the Debtor shall file with the Court and serve upon all Qualified Bidders, and other entities set forth in the Bidding Procedures Order, a notice identifying the Successful Bidder and the

principal terms of the Successful Bid and the Back-up Bidder and the principal terms of the Back-up Bid.

---

### B.    Notice Procedures

36.    The Debtor shall, within two (2) days of entry of the Bidding Procedures Order, serve a copy of each of the Sale Motion (without exhibits), the proposed form of Sale Order, the Bidding Procedures Order, and a copy of the Sale Notice (substantially in the form attached as **Exhibit C** hereto) by first-class mail, postage pre-paid, upon the following parties (collectively, the "Notice Parties"): (i) all entities known to have expressed an interest in a transaction with respect to the Debtor, the Bank or the Bank Common Stock; (ii) all equity shareholders of the Debtor; (iii) any entities known to have asserted any lien, claim, interest or encumbrance in or upon the Bank Common Stock; (iv) all Federal, state, and local regulatory and taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Sale Motion, including the KDFI, the FDIC, the SEC and the Federal Reserve; (v) all parties to the SPA and all related agreements; (vi) the Office of the United States Trustee; (vii) the Internal Revenue Service; (viii) Wilmington Trust Company in its capacity as (a) Institutional Trustee and Delaware Trustee of the American Founders Statutory Trust I and (b) Debenture Trustee for the Fixed/Floating Rate Junior Subordinated Deferrable Interest Debentures Due 2036; (ix) all entities that have requested notice in accordance with Fed. R. Bankr. P. 2002; and (x) counsel to any official committee established in this case, or if no such committee has been appointed, the twenty (20) largest unsecured creditors of the Debtor.

37.    The Debtor also proposes, pursuant to Fed. R. Bankr. P. 2002(d) and 2002(l), that within ten (10) days after entry of the Bidding Procedures Order, or as soon thereafter as is practicable, the Debtor shall cause notice, substantially in the form attached hereto as **Exhibit D**

(the "Publication Notice"), to be published in a national publication to be determined prior to or

at the hearing on this motion, the Lexington Herald Leader, and the Louisville Courier Journal.

This Publication Notice shall constitute an additional component of the Sale Notice.

## ARGUMENTS AND AUTHORITY

**A.      The Sale Should be Approved Under Bankruptcy Code Section 363(b).**

38.      Pursuant to section 363(b), a debtor may sell property of the estate outside of the

ordinary course of business after notice and a hearing. 11 U.S.C. § 363(b). The Sixth Circuit

Court of Appeals has held that bankruptcy courts may approve a sale of assets, outside of the

bankruptcy plan process, where the debtor articulates a "sound business purpose" for the sale.

*Stephens Indus. Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986).  Section 363(b)(1) of the

Bankruptcy Code empowers the Court to allow a debtor in possession, "after notice and a

hearing, [to] may use, sell, or lease, other than in the ordinary course of business, property of the

estate." 11 U.S.C. § 363(b)(1). Where a debtor believes in the exercise of its business judgment

that such a use, sale, or lease of property of its bankruptcy estate is in the best interests of the

debtor and its estate, the debtor may enter into such a transaction outside the ordinary course of

business.  *See Stephens Indus. Inc. v. McClung*, 789 F.2d at 389-90 (holding that "a bankruptcy

court can authorize a sale of all of a Chapter 11 debtor's assets under § 363(b)(1) when a sound

business purpose dictates such action.") (citing *Committee of Equity Sec. Holders v. Lionel Corp.

(In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983)); *see also In re Continental Airlines,

Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) (finding that, "for the debtor-in-possession to satisfy its

fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business

justification for . . . selling . . . the property outside the ordinary course of business.") (internal

citations omitted).  Courts typically consider the following four factors in determining whether a

proposed sale satisfies this standard: (i) a sound business reason; (ii) accurate and reasonable

notice; (iii) adequate price; and (iv) good faith. *In re Nicole Energy Servs., Inc.*, 385 B.R. 201, 231 (Bankr. S.D. Ohio 2008) (quoting *In re Country Manor of Kenton, Inc.*, 172 B.R. 217, 220-21 (Bankr. N.D. Ohio 1994)). As set forth below, the proposed Sale satisfies each of these four factors and should be approved.

39.    <u>Sound Business Reason</u>: [10]   The Debtor has a sound business reason for the Sale of the Bank Common Stock.  The Debtor is in default under the TRuPs and the Senior Note and the Bank, the Debtor's primary asset, is in significant need of recapitalization. The Debtor does not have sufficient funds to satisfy its obligations under the TRuPs and the Senior Note and to recapitalize the Bank.  Absent an infusion of capital into the Bank, the Regulators may ultimately place the Bank in receivership, eliminating any value of the Bank Common Stock. The Debtor has actively marketed the Bank for more than five years and, until the current offer, has been unable to find an investor wiling to purchase the Bank Common Stock and/or recapitalize the Bank. The proposed Sale, and associated sale process, is the Debtor's best, if not only, opportunity to generate value from the Bank Common Stock and to preserve the viability of the Bank as a going concern.

40.    <u>Adequate and Reasonable Notice</u>:   The Bidding Procedures will provide all interested parties with adequate and reasonable notice of the Sale. Full disclosure of the terms of the Sale and the requirements for placing a competing bid will be provided, through the Sale Notice, to all of the Debtor's creditors, equity holders, and all other parties who have previously expressed an interest in purchasing or financing the Debtor or the Bank. Furthermore, the Publication Notice will be published in a national publication, the Lexington Herald-Leader and the Louisville Courier Journal.   Such broad notification to creditors and parties-in-interest

---

[10] For more detail, see the Brauch Declaration generally, and specifically the section labeled "RATIONALE FOR THE PETITION AND THE GLOBAL TRANSACTION."

constitutes sufficient notice for purposes of section 363 of the Bankruptcy Code. *See, e.g.,*

*Folder Adam Security Inc. v. DeMatteis/MacGregor*, 209 F.3d 252, 265 (3d Cir. 2000)

([S]ufficient notice includes "the time and place of any public sale, the terms and conditions of

any private sale, [and] states the timing for filing objections . . . .").

41.     Adequate Price:  The Debtor has actively marketed the Bank Common Stock and

the Purchase Price contained in the SPA is the highest and best offer it has received for the Bank

Common Stock. The Purchase Price is in excess of the value of the Debtor's estimate on the

value of the Bank (as described in the Brauch Declaration) and, even if no other offer were to be

received, would constitute a fair and reasonable price for the Bank Common Stock. Nevertheless,

the Debtor intends to continue to market the Bank Common Stock and to conduct an Auction in

which higher and better bids for the Bank Common Stock will be accepted. An auction sale

generally produces sufficient and fair value for the assets being sold therein. *See, e.g., In re*

*Colony Hill Assocs.*, 111 F.3d 269, 276 (2d Cir. 1997) (holding that the auction price is sufficient

to establish that the purchaser paid fair value); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143,

149 (3d Cir. 1986); *In re Trans World Airlines, Inc.*, Case No. 01-00056, 2001 WL 1820326, at

*4 (Bankr. D. Del. Apr. 2, 2001). Accordingly, the purchase price will be fair, reasonable, and in

the best interests of the Debtor's estate and creditors.

42.     Good Faith:  The proposed Sale Transaction between the Debtor and the Stalking

Horse Bidder is in good faith, and therefore satisfies the requirements of section 363(m) of the

Bankruptcy Code. Though the bankruptcy code itself does not define the term 'good faith

purchaser,' courts have adopted the 'traditional equitable definition of a 'good faith purchaser,'

defined as 'one who purchases the assets for value, in good faith, and without notice of adverse

claims.'" *Made in Detroit, Inc. v. Official Comm. of Unsecured Creditors of Made in Detroit,*

*Inc. (In re Made in Detroit, Inc.)*, 414 F.3d 576, 581 (6th Cir. 2005) (quoting *In re Rock Indus.*

*Mach. Corp.*, 572 F.2d 1195, 1197 (7th Cir.1978)). In order "to be covered under the statutory

protection of § 363(m), [a purchaser] must demonstrate that it purchased the [p]roperty 'in good

faith' and that it did so 'for value.'" *Id.* (quoting *In re Abbotts Dairies of Pennsylvania, Inc.*, 788

F.2d 143, 147 (3d Cir.1986)).

43.    The negotiations between the Bank and Butler which have resulted in the various

components of the Global Transaction have been conducted on an arms-length noncollusive

basis, involving (among other things) separate legal counsel for both Butler and the Bank, over

the nearly three years since WPB-AFB acquired the Senior Note.  Butler's forbearance from

having WFB-AFB foreclose upon the Bank Common Stock under Senior Note has given the

Bank the time to stabilize itself operationally (through, among other things, improving its asset

quality) and conduct the exhaustive efforts outlined above to find a buyer for all, or a portion of,

the Bank.  Butler's support of the Debtor's exhaustive marketing processes and direct

communications with regulators likely earned the Debtor breathing room with its regulators.

Moreover, as a result of the protracted, good faith negotiations conducted between Butler and the

Bank, Butler has agreed to take the following actions in order to complete the Global

Transaction: (a) serve as stalking horse bidder pursuant under the SPA to acquire the Bank

Common Stock;  (b) provide $70,000 in debtor-in-possession financing and $150,000 toward

investment banker and wind-down fees under the SPA; and (c) paying the Bank $7,100,000

under the REO Agreement.

44.    To the extent that the ultimate purchaser is a party other than the Stalking Horse

Bidder, that party's compliance with the Bidding Procedures, in addition to a proffer from that

party, will be sufficient to establish its good faith. In the context of a judicial auction sale, courts

have indicated that a party must show fraud or collusion between bidders, or with the debtor-in-possession, in order to demonstrate a lack of good faith on the part of the eventual purchaser. *See In re Colony Hill Assocs.*, 111 F.3d at 276; *see also Made in Detroit*, 414 F.3d at 581.

**B.      The Sale of the Bank Common Stock Free and Clear of Liens, Claims and Interests is Authorized Under Bankruptcy Code Section 363(f).**

45.      Section 363(f) of the Bankruptcy Code governs the sale of property of the estate free and clear of claims and interests.  In particular, § 363(f) identifies five circumstances that would justify a sale free and clear:

(f)      The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate only if -

(1)      applicable non bankruptcy law permits sale of such property free and clear of such interest;

(2)      such entity consents;

(3)      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)      such interest is in bona fide dispute; or

(5)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

46.      Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell estate property free and clear of all liens, claims and encumbrances if any one of the five conditions listed therein are satisfied. 11 U.S.C. § 363(f). *See also In re Dura Automotive Systems, Inc.*, 2007 WL 7728109, at *93 (Bankr. D. Del. Aug. 15, 2007) (citing cases); *In re Wolverine Radio Co.*, 930 F.2d 1132, 1147, n. 24 (6th Cir. 1991). The Debtor submits that, as of the Sale Hearing, it will have satisfied at least one of the five conditions set forth in section 363(f) and, therefore,

requests that the Bank Common Stock be transferred to the Successful Bidder free and clear of all liens, claims, interests, and encumbrances.[11]

## C.    The Bidding Protections are Reasonable and Necessary.

47.    Pursuant to section 5.8 of the SPA, the effectiveness of the SPA is contingent upon the payment of a break-up fee and expense reimbursement to the Stalking Horse Bidder if the Debtor elects to sell the Bank Common Stock to a party other than the Stalking Horse Bidder. The Debtor and the Stalking Horse Bidder have agreed to a break-up fee of $429,121.87, which is equal to 3% of the Purchase Price (the "Break-Up Fee") and an expense reimbursement for all reasonable and documented expenses (including attorneys' fees and costs) incurred by the Stalking Horse Bidder in connection with or relating to the proposed transactions contemplated by the SPA in an amount not to exceed $350,000 (the "Expense Reimbursement" and collectively with the Break-Up Fee, the "Bidding Protections").  The Stalking Horse Bidder has agreed not to require any overbid in excess of the Purchase Price plus the Bidding Protections.

48.    Courts within the Sixth Circuit have approved the payment of break-up fees and other bid protections to stalking horse bidders.  *See, e.g., In re AmTrust Financial Corp.*, Case No. 09-21323, 2010 WL 4917557, at *1-2 (Bankr. N.D. Ohio Sept. 22, 2010); *In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992). In determining whether stalking horse bid protections are appropriate, courts should consider the following factors: (i) whether the fee requested correlates with a maximization of value to the estate; (ii) whether the underlying agreement is an arms-length transaction; (iii) whether the principal secured creditors and the committee are supportive of the concession; (iv) whether the fee constitutes a fair and reasonable

---

[11] The only interest in the Shares of which the Debtor is aware is the lien held by WPB-AFB as security for the Senior Note.  WPB-AFB has consented to the Sale, as evidenced by its execution of the SPA and participation as the Stalking Horse Bidder, and, therefore, section 363(f)(2) has been satisfied.  To the extent that other liens or interests are asserted, such claims will likely be subject to a bona fide dispute (as the Debtor is unaware of any such claims), and, even if valid, such claims will simply attach to the net proceeds of the Sale.

percentage of the proposed purchase price; (v) whether the dollar amount of the fee is so substantial that it provides a "chilling effect" on other bidders; (vi) the existence of potential safeguards beneficial to the estate; and (vii) whether there is a substantial adverse impact upon unsecured creditors. *In re Nashville Senior Living, LLC*, 2008 WL 5062366, at *2 (Bankr. M.D. Tenn. Oct. 22, 2008); *see also In re Hupp Indus.*, 140 B.R. at 194.

49.     The Debtor and the Stalking Horse Bidder negotiated the Bidding Protections at arms' length and through substantial negotiation. Due to the nature of the Bank Common Stock, the Stalking Horse Bidder was required to undergo a more extensive due diligence process, to investigate jointly with the Debtor what type of transaction could help it escape from its long-term capitalization issues, and to expend significant sums to obtain regulatory pre-approval. By inducing the Stalking Horse Bidder to make an offer on the Debtor's assets (as well as providing a DIP loan—knowing that it may never receive any repayment—and committing to funding wind-down expenses upon closing of the sale, which collectively are allowing the Debtor to conduct a sale process in bankruptcy), the Bidding Protections will maximize the value of the Debtor's estate.  Without the Bidding Protections, the Stalking Horse Bidder would not have been willing to spend the substantial time and resources required to complete the necessary due diligence and obtain regulatory pre-approval for the transaction. There are safeguards in place to ensure that the Debtor receives the highest and best price for the Bank Common Stock because the Sale is taking place through a public auction.  The Bidding Protections induced the stalking horse bid and facilitated the sales process by which higher and better bids can be received.

50.     Furthermore, the proposed Bidding Protections are fair, reasonable and within the range of similar protections approved in other financial services holding company cases. *See, e.g., In re Roger's Bancshares, Inc.*, Case No. 13-13838, Docket No. 86 (Bankr. E.D. Ark.

2013); *In re Americanwest Bancorp*, Case No. 10-06097, Docket No. 64 (Bankr. E.D. Wash. 2010); *In re Big Sandy Holding Co.*, Case No. 12-30138, Docket No. 67 (Bankr. D. Col. 2012). The Break-up Fee is equal to three percent (3%) of the purchase price.  As such, the Debtor submits that the Bidding Protections are reasonable in light of the extensive costs incurred by the Stalking Horse Bidder, the amount of the Purchase Price and the infusion of necessary capital, and the limited effect on unsecured creditors.

**D.     The Court Should Waive the Fourteen (14) Day Stay Period.**

51.     The Debtor requests that the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h) be waived. Due to the financial and regulatory concerns cited above it may be imperative that the Sale to the Successful Bidder be consummated as quickly as possible. Further, the Debtor has provided sufficient notice of this Sale Motion to the parties set forth below and will also provide the Sale Notice to the parties listed in the Bidding Procedures Order; these parties will be afforded a reasonable opportunity to raise any objections and be heard by the Court. Therefore, there will be no prejudice to creditors and parties-in-interest as a result of the waiver of the fourteen (14) day Stay.

## NOTICE

40.     Notice of this Motion has been given via overnight delivery and/or electronic mail to the following parties: all entities known to have expressed an interest in a transaction with respect to the Debtor, the Bank or the Bank Common Stock; any entities known to have asserted any lien, claim, interest or encumbrance in or upon the Bank Common Stock; the U.S. Trustee for the Eastern District of Kentucky; the Debtor; all secured creditors of the Debtor, specifically, WPB-AFB, LLC and Dinsmore & Shohl, as counsel to WPB-AFB LLC; all unsecured creditors of the Debtor, specifically, Wilmington Trust Company in its capacity as (a) Institutional Trustee and Delaware Trustee of the American Founders Statutory Trust I and (b) Debenture Trustee for

the Fixed/Floating Rate Junior Subordinated Deferrable Interest Debentures Due 2036; and those equity shareholders of the Debtor holding a 1% or greater interest therein. In addition, notice of this Motion has also been given via U.S. Mail, postage prepaid, to the following parties: all equity shareholders of the Debtor with a 1% or less interest therein; the Internal Revenue Service; the Securities and Exchange Commission; the Kentucky Revenue Cabinet;  the Kentucky Department of Financial Institutions; the FDIC; and the Federal Reserve Bank of St. Louis (collectively, the "Notice Parties"). The Debtor respectfully submits that, under the circumstances, no other or further notice is warranted.

## **CONCLUSION**

WHEREFORE, for all of the foregoing reasons, the Debtor respectfully requests that the Court (a) approve the proposed Bidding Procedures and enter the Bidding Procedures Order, substantially in the form as the order attached hereto as **Exhibit A** and authorize the Sale pursuant to section 363; (b) approve WPB-AFB, LLC or its assignee as Stalking Horse Bidder; (c) approve the form and manner of the Sale Notice and the Publication Notice; (d) schedule the Sale Hearing within five (5) days of the Bid Deadline and within forty-five (45) days of the Petition Date; and (e) grant such other and further relief as the Court deems just and proper.

## **NOTICE OF HEARING**

Notice is hereby given that the foregoing Motion will be heard by the Court on June 19, 2015 at 9:00 a.m. (ET) or as soon thereafter as counsel may be heard in the United States Bankruptcy Court, 2nd Floor Courtroom, 100 East Vine Street, Lexington, Kentucky 40507.

Respectfully submitted,

STOLL KEENON OGDEN PLLC

/s/ Adam M. Back
Adam M. Back
Joseph M. Scott, Jr.
Jessica L. Haurylko
300 West Vine Street, Suite 2100
Lexington, Kentucky 40507
Telephone: (859) 231-3000
Facsimile: (859) 253-1093
E-mail: adam.back@skofirm.com
              jessica.haurylko@skofirm.com

*Proposed Counsel for the Debtor and
Debtor in Possession*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served on this 16th day of June 2015, electronically upon all parties having entered an appearance in this case in accordance with the method established under this Court's CM/ECF Administrative Procedures, and to all Notice Parties via overnight delivery, postage prepaid, electronic mail, and/or regular U.S. Mail, postage prepaid, as further detailed hereinabove.

/s/ *Adam M. Back*
Proposed Counsel for the Debtor and
Debtor in Possession

115449.152190/4392001.16